IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
2020 MAR 23  PM 4: 11

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
        DEPUTY

| | |
|---|---|
| ALBINA ROQUE AND VICENTE ROQUE, INDIVIDUALLY, AS HEIRS AT LAW TO THE ESTATE OF JASON ROQUE, AND ON BEHALF OF ALL WRONGFUL DEATH BENEFICIARIES,<br>　　　　　　　PLAINTIFFS,<br><br>V.<br><br>JAMES HARVEL, IN HIS INDIVIDUAL CAPACITY, AND THE CITY OF AUSTIN,<br>　　　　　　　DEFENDANTS. | CAUSE NO. 1:17-CV-932-LY |

## ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Before the court in the above-styled and numbered case are motions for summary judgment from each defendant asserting entitlement to qualified immunity in connection with a police-involved shooting of a suicidal suspect that occurred on May 2, 2017.

The first is Defendant James Harvel's Motion for Summary Judgment filed April 1, 2019 (Dkt. No. 57), Plaintiffs Albina Roque and Vicente Roque's (the "Roques") Response filed April 29, 2019 (Dkt. No. 64), Harvel's Reply filed May 13, 2019 (Dkt. No. 77), and the Roques' Sur-reply filed May 28, 2019 (Dkt. No. 88).

The second is Defendant The City of Austin's (the "City") Motion for Summary Judgment filed April 30, 2019 (Dkt. No. 67), the Roques' Response filed June 3, 2019 (Dkt. No. 92), the Roques' Response filed June 12, 2019 (Dkt. No. 98), the City's Reply filed July 1, 2019 (Dkt. No. 110), and the Roques' Sur-reply filed July 10, 2019 (Dkt. No. 118).

Having reviewed the parties' pleadings, exhibits, and the governing case law, the court now renders the following opinion and order.

This case arises out of the Roques' allegations that James Harvel, an officer of the Austin Police Department (the "Department"), subjected their son Jason Roque to excessive force and racial discrimination while responding to an attempted-suicide call. The Roques assert several causes of action against Harvel and the City for violations of Jason's rights under the United States Constitution and Albina Roque's rights as a bystander. *See* 42 U.S.C. § 1983 ("Section 1983").

First, the Roques claim that Harvel violated Jason's Fourth Amendment right to be free from the use of excessive force. *See* U.S. CONST. amend. IV. Second, Albina Roque asserts a bystander claim because she witnessed the death of her son. Third, the Roques submit a *Monell* claim that the City promulgated policies or practices that violated Jason's Fourth and Fourteenth Amendment rights, including, among others, inadequate training and "[d]iscriminating against minority suspects by using unwarranted deadly force at disproportionally higher rates." *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

The court draws the facts from the summary-judgment record, which includes several video recordings of the incident captured from different vantage points, views the evidence in the light most favorable to the nonmoving party, and "assign[s] greater weight . . . to the facts evident from video recordings taken at the scene." *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011) (citing *Scott v. Harris*, U.S. 372, 381, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007)).

I.   **Factual Background**

On May 2, 2017, the Department received two 9-1-1 calls about Jason Roque, a potentially suicidal Hispanic 20-year-old. Jason called first to report a shirtless Hispanic man wearing brown shorts "just going crazy," not pointing a black pistol at anybody, but "all up in the air and whatnot" and "aiming it at the house." Albina called next, asked for a Spanish speaker, and—while crying—explained that her "mentally sick" son Jason wanted to kill himself and that the gun was a toy.

2

James Harvel, an officer on patrol in the northeast region of Austin (referred to by the Department as "Edward Sector"), was informed about the situation from the Computer Aided Dispatch ("CAD") report displayed on his terminal and Edward Sector radio-band transmissions. Both reported Jason's suicidal threats at 11313 Long Winter Drive in the city of Austin.

At 11:04 a.m., a CAD report informed Harvel of a 9-1-1 call about a "hm wrng bro shorts, no shirt w/gun waving it around" (Hispanic male wearing brown shorts, no shirt, waving a gun around). At 11:07 a.m., the CAD showed that a second caller, "Alvina" (Albina), made a duplicate call that the Hispanic male was her son Jason, who she claimed wore "BJS" (blue jeans) and had no weapons. At 11:12 a.m., the CAD again updated to inform Harvel that Albina had repeatedly said that Jason did not have a gun but then later confirmed that he did. At 11:15 a.m., the CAD advised Harvel that the "Gun Urgent" call's description was updated to "Attempted Suicide."

The Edward Sector radio transmissions likewise told Harvel that before the officers arrived, Jason "was waving a gun around, was not pointing it at anyone, but just throwing it around in the air. A black pistol." After being questioned by the dispatcher, Albina first responded that there was no weapon, but later said there was. The dispatcher informed officers that Jason's only recent police involvement was for criminal mischief in 2016, and she did not "see any hazards for him."

Harvel was one of the officers that responded to the dispatcher. Upon arrival, Harvel and other officers fanned out approximately 75 yards away and saw Jason pacing along Long Winter Drive empty-handed, repeatedly saying, "Shoot me!" Without making any threatening movements toward anyone, Jason walked slowly toward the officers. It was a clear day with good lighting, and Harvel could see clearly throughout the encounter. Though not visible from the officers' position, Albina was standing on the porch behind a column yelling "Jason!" and pleading with the officers to not shoot Jason. Jason screamed, "my life sucks!" and "my fucking life sucks!"

3

Multiple officers approached Jason and repeatedly shouted at him. One officer yelled, "Put your hands up!" Whether Jason complied is disputed, but according to the Roques' version of the facts and uncontroverted by video evidence, Jason complied by holding both arms out to his side. Jason continued past 11317 Long Winter, the house next door to his family's home. Jason then yelled to the officers, "Just shoot me, just kill me, just fucking kill me!" In full view of the officers, Jason then pulled out a black gun from the front of his waistband, immediately placed it at his right temple, and again asked the officers to kill him. The officers would later learn that the "gun" was not a firearm, but a BB pistol. The officers can be heard on video observing that "[Jason]'s got a gun to his head; he's got a gun to his head." With the gun at his head, Jason walked away, momentarily turning back to shout, "I'll fucking kill myself!" at the officers.

Jason never verbally threatened anyone except himself. All officers stated that they did not know where the gun was, where the gun was pointed, or where Albina was located, yet Harvel, located several houses down, took at aim at Jason's back with a LaRue LT-15 semi-automatic rifle.

As Jason slowly walked back past 11317 Long Winter with the gun pointed down, an officer yelled for the first time, "Put the gun down!" Though no officers saw it, video evidence reveals that simultaneously with the command to put the gun down, Jason began directing the gun in the officers' general direction. At 11:18 a.m., in the split-second after the command, Harvel fired the first shot. The first shot struck Jason in the lower left side of his back and caused him to drop the gun, double over in pain instantly, and stumble away diagonally into the street. Video evidence suggests that the gun could be seen falling to the pavement from Harvel's vantage point 63.6 yards away, and it remained visible during the remainder of the encounter. The shot had disarmed Jason—the black gun rested behind him, contrasted against the white sidewalk. After

4

the first shot, Jason received no further commands from any of the police officers. Harvel stated that he did not look at Jason's hands to ascertain whether Jason remained armed after the shot.

Approximately two seconds later, Harvel fired a second shot that missed. Jason objectively staggered further away from the BB pistol, Albina, and the officers and into the street. After another two-second pause, Harvel fired the fatal third shot, striking Jason through the chest, which caused him to collapse and rapidly bleed out in the street.

After the third shot, police officers established a dressing along the left side of Jason's chest and attempted cardiopulmonary resuscitation (CPR) with a bag valve mask until 11:24 a.m., when the paramedics with the Austin Fire Department and Austin-Travis EMS arrived. The paramedics continued CPR with the placement of a C-collar. Paramedics transported Jason to an emergency room at 11:28 a.m. and arrived at 11:42 a.m., continuously administering CPR throughout. Despite successful intubation, Jason was pronounced dead at 11:50 a.m.

According to Harvel's affidavit, the decision to fire at Jason was not based on Jason pointing the gun toward the officers, because Harvel "did not see [Jason] point the weapon in the direction of [Harvel] and the police officers who had responded to the scene." Instead, the stated justifications for using deadly force were Jason's failure to disarm, Jason's agitated appearance and recklessness with the gun's muzzle, and Harvel's belief that Jason was a persistent threat "intending to shoot [Albina]." When asked about why he used deadly force, Harvel stated that he "didn't want two people hurt that day and [he] thought [deadly force] was the only way to stop [Jason]." Notwithstanding Jason being loud and upset, no officer heard Jason threaten Albina.

Forensics reveal that the fatal shot entered through the right side of Jason's chest and exited through his left armpit, re-entering and exiting through his left arm. Jason's blood pooled 77 yards away from the officers. The location of the pool of Jason's blood relative to the site of the BB

pistol, which fell 10-16 yards away, indicates that Jason was moving away from Albina, who stayed on the front porch. This is inconsistent with statements that Jason kept moving towards and endangering Albina.

## ANALYSIS

### I. Motions for Summary Judgment

#### A. Legal Standard

A party is entitled to summary judgment on all or any part of a claim as to which there is no genuine issue of material fact and as to which the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986)). If the moving party meets this burden, the nonmovant is required to go beyond the pleadings and show admissible evidence that specific facts exist over which there is a genuine issue for trial. *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1046–47 (5th Cir. 1996). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and articulate the precise way that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the summary judgment motion. *Id.*

"Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, courts must grant summary judgment. *Celotex*, 477 U.S. at 322–23.

**B. Application**

The court first evaluates Harvel's summary-judgment motion on qualified immunity and then proceeds to analyze the City's.

**1. Harvel's Summary-Judgment Motion**

The Roques claim that Harvel used excessive force against Jason in violation of the Fourth Amendment and that Albina, as a bystander, is entitled to damages. Harvel argues he is entitled to qualified immunity on both claims. The court will grant in part and deny in part Harvel's motion for summary judgment for the reasons discussed below.

### a. Qualified Immunity

Qualified immunity protects public officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 137 S.Ct. 548, 196 L.Ed.2d 463 (2017); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The qualified immunity inquiry is a two-step process: (1) the court first determines whether the officer's alleged conduct has violated a federal right; (2) the court next determines whether the right in question was "clearly established" at the time of the alleged violation, such that the officer was on notice of the unlawfulness of his conduct. *Cole v. Carson*, 935 F.3d 444, 451 (5th Cir. 2019) (citing *Tolan v. Cotton*, 572 U.S. 650, 655–56, 134 S.Ct. 1861, 188 L.Ed.2d 895 (2014) (per curiam)). The reasonableness of an officer's actions is "judged against the backdrop of the law at the time." *Brosseau v. Haugen*, 543 U.S. 194, 198, 124 S.Ct. 596, 160 L.Ed.2d 583 (2004 (per curiam).

Qualified immunity for the use of deadly force is assessed at the moment a law-enforcement officer confronts a suspect. *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989). However, the officer's understanding of facts leading up to the event colors the question of whether "a reasonable officer" could have believed his life or the lives of others were endangered. *Pauly*, 137 S.Ct. at 550, 552. Additionally, the court must make "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. The court's inquiry is limited to whether the officer "was in danger at the moment of the threat" that resulted in the use of force. *Rockwell v. Brown*, 664 F.3d 985, 991 (5th Cir.2011).

Qualified immunity "is designed to shield from civil liability 'all but the plainly incompetent or those who violate the law.'" *Brady v. Fort Bend Cty.*, F.3d 173, 174 (5th Cir. 1995). However, the court must view the facts and draw reasonable inferences in the light most favorable to the nonmovant and ask whether the movant would be entitled to qualified immunity on those most-favorable-to-the-non-movant facts. *See Cole*, 935 F.3d at 452 (citing *Lytle v. Bexar Cty.*, Tex., 560 F.3d 404, 409 (5th Cir. 2009)). If the allegations could make out a constitutional violation, the court must determine whether it would be clear to any reasonable officer that his conduct was unlawful in the situation he confronted. *See Kisela v. Hughes*, 138 S. Ct. 1148, 200 L.Ed.2d 449 (2018) (per curiam).

If the court's determination of qualified immunity would require the resolution of a genuinely disputed fact, then that fact is material. *See Lytle*, 560 F.3d at 408. "If an excessive force claim turns on which of two conflicting stories best captures what happened on the street, the case law will not permit summary judgment in favor of the defendant official . . . A trial must be had." *Cole*, 935 F.3d at 456. (citation and internal quotation marks omitted).

### i. Violation of a Constitutional Right

The Fourth Amendment confers a right to be free from excessive force during the "seizure" of a person. *Graham*, 490 U.S. at 388. A plaintiff must show "(1) an injury (2) which resulted directly and only from the use of force that was clearly excessive to the need and (3) the force used was objectively unreasonable" to establish a claim of excessive force under the Fourth Amendment. *Cass v. City of Abilene*, 814 F.3d 721, 731 (5th Cir. 2016). The Roques assert that Jason was killed by Harvel's excessive and unreasonable use of force. The relevant inquiries then are whether Harvel's use of force was clearly excessive and objectively unreasonable. These inquiries are "often intertwined." *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012).

Whether force is excessive or unreasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Other factors when determining whether the amount of force used is excessive include: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2473 (2015).

Moreover, the "reasonableness" of a particular use of force is judged from the perspective of an officer at the scene, rather than the 20/20 vision of hindsight. *Graham*, 490 U.S. at 396. "Not every push or shove even if it may later seem unnecessary in the peace of a judge's chamber violated the Fourth Amendment." *Id.* (citation and internal quotation marks omitted). It is well-established that an officer may consider a suspect's refusal to comply with instructions in assessing whether physical force is needed to effectuate the suspect's compliance. *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (per curiam). However, "an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased." *Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 277 (5th Cir. 2015) (citing *Lytle*, 560 F.3d at 413). In sum, excessive-force claims are "necessarily fact-intensive" and whether the force used was excessive "depends on the facts and circumstances of each particular case." *Deville*, 567 F.3d at 167 (citation and quotation marks omitted).

"Use of deadly force is not unreasonable when an officer would have reason to believe that the suspect poses a threat of serious harm to the officer or others." *Mace v. City of Palestine*, 333

F.3d 621, 624 (5th Cir. 2003). Conversely, it is "objectively unreasonable to use deadly force unless it is necessary to prevent [a suspect's] escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Flores v. City of Palacios*, 381 F.3d 391, 399 (5th Cir. 2004) (internal citations and quotations omitted). Here, the questions are: (1) Was Jason a threat? (2) Did Jason remain a threat?

The officer's reasonableness in using force—deadly or non-deadly—is analyzed under an objective standard "in light of the facts and circumstances confronting [the officer], without regard to [his] underlying intent or motivation." *Graham*, 490 U.S. at 397. The court concludes that Harvel is entitled to qualified immunity as a matter of law with regard to the first shot fired at Jason. After the command to drop the weapon, but before Harvel fired his first shot, Jason began directing the gun in the direction of the officers. Given the tense situation, an armed and angry suspect, the movement of Jason's arm toward the officers reasonably created the perception of a threat that justified the use of deadly force.

However, the facts following that first shot are disputed, and the court concludes that genuine issues of material fact are presented regarding the final two shots, requiring the denial of summary judgment in part. *See Mason*, 806 F.3d at 277 (granting qualified immunity for officer in part for five shots fired by officer that incapacitated suspect and denying in part final two shots fired by officer when suspect no longer posed immediate threat.)

Based on the Roques' version of the facts, combined with the video evidence, the physical evidence, and the undisputed facts, a reasonable jury could find that Harvel's use of force was clearly excessive and objectively unreasonable vis-à-vis the shots that occurred after Jason dropped the gun. According to the Roques' account, there was no reason to believe Jason posed a threat to Harvel, his mother, or the public once he dropped the weapon.

The court will not consider allegations that Jason was or was not a threat because he planned to commit "suicide by cop" by forcing a deadly confrontation with the police because, if that was Jason's plan, Harvel was unaware of it. *See, e.g., Pauly*, 137 S.Ct. at 550 (2017) (per curiam) ("Because this case concerns the defense of qualified immunity . . . the Court considers only the facts that were knowable to the defendant officers."); *Kingsley*, 135 S.Ct. at 2474, (stressing that "a court must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer"). The court considers only what the officers knew at the time of their challenged conduct. *Hernandez v. Mesa*, 137 S. Ct. 2003, 2007, 198 L.Ed.2d 625 (2017) (per curiam) ("Facts an officer learns after the incident ends—whether those facts would support granting immunity or denying it—are not relevant.").

The question is this: viewing the facts objectively—after being shot, dropping and abandoning the gun—did Jason appear to be in any condition to fire his weapon? Harvel says, "yes," but the Roques say, "no." Viewing the facts in the light most favorable to the Roques, the court finds there to be a genuine issue of material fact whether Harvel violated Jason's constitutional rights by shooting Jason while already "incapacitated" and could no longer be reasonably perceived as a threat. *See Graves*, 277 Fed. Appx. at 348–49. From the summary-judgment proof before the court, the court finds that a reasonable jury could conclude that an officer at the scene would have found firing additional shots from a high-velocity LT-15 rifle to be objectively unreasonable. Genuine fact issues remain as to whether Harvel violated Jason's Fourth Amendment right to be free from excessive force as Jason retreated without the BB pistol.

    ii. **Clearly Established Law**

If an officer is found to have violated a constitutional right, analysis of whether the law was clearly established law at the time is undertaken with close attention to the relevant legal rule

and the particular facts of the case. *Cole*, 935 F.3d at 452 (citing *Mullenix v. Luna*, 136 S. Ct. 305, 193 L. Ed. 2d 255 (2015)). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Lytle*, 560 F.3d at 410 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001) *overruled in part by Pearson v. Callahan*, 555 U.S. 223 (2009)).

In 1985, *Tennessee v. Garner* announced the principle that the use of deadly force is permitted only to protect the life of the shooting officer or others: "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). On May 2, 2017, it was clearly established law that when a suspect is incapacitated by being shot such that the suspect no longer posed a threat, firing additional shots would be an excessive application of force. *See Mason*, 806 F.3d at 278; *see also Graves v. Zachary*, 277 Fed. Appx. 344, 347 (5th Cir. 2008) (unpublished). Where a suspect posed no threat, "the violation of his constitutional rights would have been obvious even without a body of relevant case law . . . Under general precedents such as *Garner*, [the officer] should have known that his use of force was excessive." *Cole v. Carson*, 905 F.3d 334, 344 (5th Cir. 2018), *reh'g en banc granted*, 915 F.3d 378 (5th Cir. 2019), *on reh'g en banc*, 935 F.3d 444 (5th Cir. 2019) (citing *Graves*, 277 Fed. Appx. at 349).

*Mason* provides the most useful precedent for the court's analysis here. In *Mason*, a police officer had fired five shots at a suspect, temporarily stopped firing, and then fired twice more. *Mason*, 806 F.3d at 273–74. There the Fifth Circuit explained that reasonable juries could conclude that continuing to use deadly force against a suspect once the immediate danger had objectively passed would violate the Fourth Amendment. *Id.* at 277. "The constitutionality of the

13

final two shots can be decided on the threshold issue—under *Garner*—of whether *deadly force* was permissible, i.e., whether [the suspect] objectively posed an immediate threat." *Id.* at 278 (emphasis in original). "A reasonable jury could conclude that when [the officer] fired the final two shots, [the suspect] would have appeared incapacitated to an objectively reasonable officer." *Id.*

In the Roques' narrative of the facts, Jason complied with the command to put his hands up and complied with the directive put the gun down after he was shot. The Roques assert that it is disingenuous to say Jason pointed the gun in the direction of the officers because officers all testified they never saw Jason pointing the gun at them, and the video shows him "simply waving it quickly in an arc as he turns around to look in the direction of the officers." For the second and third shots, it matters not how dangerous that movement was perceived.

This case is distinguishable from *Kisela v. Hughes*, where the officer *repeatedly* warned an armed suspect to disarm, yet that suspect, facing the officer and hearing his warnings, *refused* to disarm. 138 S. Ct. at 1151. Here, Jason had less than one second to respond to the command to put the gun down and then immediately dropped and abandoned the gun once struck by Harvel's first bullet. A jury could reasonably find that any officer at the scene would have known that firing again while Jason was incapacitated, unarmed, and abandoning his weapon was excessive force in violation of the Fourth Amendment. Indeed, other officers at the scene agree in their depositions that it would be excessive and unreasonable to fire at a suspect in such a scenario.

Here, based on the facts taken in the light most favorable to the non-movant Roques, and with reasonable inferences drawn in their favor, genuine issues of material fact preclude a summary-judgment determination of whether Harvel is entitled to qualified immunity on the Roques' excessive-force claim. The court finds that a reasonable jury could conclude that Harvel

violated Jason's right to be free from excessive use of force. The court concludes that Jason's constitutional right to be free from excessive force was clearly established at the time Harvel fired his second and third shots at Jason on May 2, 2017. Consequently, the court denies Harvel's motion for summary judgment on his entitlement to qualified immunity concerning the Roques' excessive force allegation as to the second and third shots.

### 2. The City's Summary Judgment Motion

The Roques allege that there were 10 unstated policies and practices that the City had in place when Harvel shot their son Jason. Moreover, the Roques contend that the known and obvious consequence of these "unstated policies and practices" was that City's police officers would be placed in recurring situations in which constitutional violations would result. Consequently, they claim, the following "unstated policies and practices" created the moving force of Jason's constitutional deprivations and injuries: (1) dispatching inadequately trained or screened officers to life-and-death crisis situations; (2) dispatching inadequately trained or screened officers to mental health crisis calls; (3) failing to adequately supervise officers during encounters involving long-range weapons; (4) failing to train officers concerning alternatives to the use of deadly force; (5) failing to train officers to de-escalate a mental health crisis rather than resort to deadly force; (6) using excessive deadly force; (7) using unwarranted deadly force at disproportionally higher rates against minority suspects; (8) failing to train officers about known wrongful shootings or to change practices afterwards; (9) treating BB guns as real guns; and (10) failing to train on the dangers of institutional racism.

In *Monell*, the Supreme Court held that a municipality cannot be held liable under Section 1983 on a theory of *respondeat superior*. 436 U.S. 658, 691 (1978). Municipalities and other local governments may incur Section 1983 liability, however, where official policy or custom

causes a constitutional violation. *Bennet v. City of Slidell*, 728 F.2d 762, 766 (5th Cir. 1984). For municipal liability to attach, a plaintiff must prove three elements: (1) a policymaker; (2) an official policy; and (3) a "violation of constitutional rights whose 'moving force' is the policy or custom." *See Valle v. City of Houston*, 613 F.3d 536, 544 (5th Cir. 2010). A municipality's official policy may be found in "written policy statements, ordinances, or regulations, but it may also arise in the form of a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 847 (5th Cir. 2009). When a policy is not facially unconstitutional, a plaintiff must demonstrate the municipality's adoption of the policy occurred with "deliberate indifference to the known or obvious fact . . . constitutional violations would result." *James v. Harris Cty.*, 577 F.3d 612, 617 (5th Cir. 2009) (quotation marks omitted).

Rather than perform an itemized analysis of all 10 of the Roques' allegations, the court summarizes them as alleging that the City is liable under Section 1983 for causing Harvel's alleged excessive use of force because (a) the City maintained inadequate training, supervision, and discipline policies and (b) the City had an unwritten custom of racial discrimination. Moving for summary judgment, the City argues the Roques have no evidence the City had inadequate training, supervision, and discipline policies or a custom of racial discrimination. The City contends that the evidence proves its policies are not inadequate as a matter of law. For the reasons described below, the court will grant the City's motion for summary judgment.

### a. Inadequate Training, Supervision and Discipline Policies

To prevail on an inadequate training, supervision, or discipline claim, a plaintiff must prove (1) the municipality's training, supervision, or discipline policy was inadequate; (2) the inadequate training, supervision, or discipline policy was a moving force in causing violation of the plaintiff's

16

rights; and (3) the municipality was deliberately indifferent in adopting its training, supervision, or discipline policies. *See Valle*, 613 F.3d at 544. This deliberate indifference standard is stringent. *See Porter v. Epps*, 659 F.3d 440, 446-47 (5th Cir. 2011) (requiring plaintiff to prove deliberate indifference for failure to promulgate policy, train, and supervise claims); *Gros v. City of Grand Prairie, Tex.*, 34 Fed. Appx. 150 (5th Cir. 2002) (per curiam) (requiring plaintiff to prove deliberate indifference for hiring, training, and supervision claims).

A municipality may be held liable only for acts that are directly attributable to it "through some official action or imprimatur." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). To show deliberate indifference, a plaintiff may either (1) show that the municipality had notice of a pattern of similar violations, or (2) demonstrate that the need for more or different training was obvious based on a single incident. *Kitchen v. Dall. Cty., Tex.*, 759 F.3d 468, 484 (5th Cir. 2014), (abrogated on other grounds); *Kingsley*, 135 S.Ct. at 2472–73. "A pattern could evidence not only the existence of a policy but also official deliberate indifference." *Piotrowski*, 237 F.3d at 582. Without a pattern, to prove deliberate indifference in the context of a claim that a city failed to train, supervise, or discipline a police officer accused of excessive force, a plaintiff must (1) identify the individual supervisor who failed to train, supervise, or discipline and (2) demonstrate that the supervisor had subjective knowledge that the police officer posed a serious risk to cause harm by using excessive force. *See, e.g., James v. Harris Cty.*, 508 F.Supp.2d 535, 551–52 (S.D. Tex. 2011).

The training that the City provides to its officers exceeds Texas's minimum requirements. *See Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 171 (5th Cir. 2010) (finding that compliance with state training minimums "counsels against" finding a failure to train). Moreover, the City provides specific training on the use of force as well as crisis intervention, mental health,

and institutional bias. The City maintains detailed policies and procedures regarding the use of force and forbidding the use of excessive force. Each officer-involved shooting prompts an evaluation of officer training, policies, and tactics, which is made by the Department's command staff. The City also has comprehensive policies and procedures in place to ensure that all uses of force are investigated and that officers are disciplined when appropriate. The Department disciplines officers determined to have used excessive force, and regularly reviews whether officers show a pattern of using force that calls for closer scrutiny.

The Roques' evidence is not sufficient to establish that the City had a facially unconstitutional policy. It is not enough to establish that the City took an official action or imprimatur or were deliberately indifferent in adopting and applying policies that violated Jason's constitutional rights. There is likewise not enough evidence to establish that the City engaged in a pattern of using excessive force in general or that the need for more or different training than what Harvel received was obvious based on a single incident. The Roques do not identify which supervisor failed to supervise Harvel or demonstrate that the supervisor had subjective knowledge that Harvel posed a serious risk to cause harm by using excessive force. Finally, the Roques' evidence is not sufficient to establish that the City's inadequate training, supervision, and discipline policies were the moving force for a violation of Jason's rights. Because deliberate indifference by the City in adopting policies has not been demonstrated, the court will grant the City's motion for summary judgment as to claims of inadequate training, supervision, or discipline.

### b. Custom of Racial Discrimination

Finally, the Roques attempt to raise a fact issue on whether the City had a custom of racial discrimination—especially in using deadly force—that was the moving force for Jason's alleged constitutional injuries. To prove their claim, the Roques must establish that there is some pattern

18

in the use of excessive force that demonstrates that the City had an unwritten policy permissive of excessive force. *Peterson*, 588 F.3d at 850. Likewise, the Roques must establish that the City has an unwritten policy permissive of excessive force against minorities. A pattern amounts to an official policy "when it is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Id.* at 850 (internal quotes and citations omitted). To establish that prior incidents constitute a pattern, the Roques must show that the incidents have occurred for so long or with such frequency that policymakers must know that the improper conduct is the ordinary and accepted practice of the municipal employees. *Id.* A pattern will not be established based on isolated incidents; the pattern must be composed of incidents that are numerous and similar to the specific violation alleged. *Id.* at 850-851. For example, in *Peterson*, the existence of 27 complaints of excessive force over four years did not show a pattern of allowing excessive force when the city had a large police force that makes thousands of arrests per year. *Id.* at 851.

The City argues the Roques have not produced adequate evidence of a custom of racial discrimination and cites the Department's Policy No. 328 and 329 prohibiting bias-based and racial profiling, respectively. In response, the Roques offered a list of serious, but isolated incidents involving minority suspects. The court concludes that no reasonable jury could find an unwritten policy and pattern of racial discrimination that meets the stringent standard laid out by *Peterson*. Accordingly, the City has shown it is entitled to judgment as a matter of law and the court will also grant summary judgment on claims of a custom of racial discrimination.

## CONCLUSION

In sum, the court will grant in part and deny in part Harvel's motion for summary judgment. Fact issues prevent a determination of whether Harvel is entitled to qualified immunity on the Roques' excessive-force claim. Viewing all facts in the light most favorable to the Roques, the

court finds that a reasonable jury could determine that Officer Harvel violated Jason's right to be free of excessive force once he dropped the gun, a right clearly established at the time of Officer Harvel's alleged misconduct.

Furthermore, the court will grant the City's motion for summary judgment. The City is entitled to judgment as a matter of law on the Roques' claims the City is liable under Section 1983 for any of its policies. Accordingly,

**IT IS ORDERED** that Harvel's Motion for Summary Judgment filed April 1, 2019 (Dkt. No. 57) is **GRANTED IN PART** as the Harvel's first shot and **DENIED IN PART** as to Harvel's second and third shots.

**IT IS FURTHER ORDERED** that the City's Motion for Summary Judgment filed April 30, 2019 (Dkt. No. 67) is **GRANTED**.

SIGNED this 23rd day of March, 2020.

LEE YEAKEL
UNITED STATES DISTRICT JUDGE