# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 1, 2021

Lyle W. Cayce
Clerk

No. 20-50277

ALBINA ROQUE, INDIVIDUALLY, AS HEIR AT LAW TO THE
ESTATE OF JASON ROQUE, AND *on behalf of* ALL WRONGFUL DEATH
BENEFICIARIES; VICENTE ROQUE, INDIVIDUALLY, AS HEIR AT
LAW TO THE ESTATE OF JASON ROQUE, AND *on behalf of* ALL
WRONGFUL DEATH BENEFICIARIES,

*Plaintiffs—Appellees*,

*versus*

JAMES HARVEL, IN HIS INDIVIDUAL CAPACITY,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:17-CV-932

Before KING, ELROD, and WILLETT, *Circuit Judges*.

## JUDGMENT

This cause was considered on the record on appeal and was argued by counsel.

IT IS ORDERED and ADJUDGED that the judgment of the District Court is AFFIRMED.

IT IS FURTHER ORDERED that each party bear its own costs on appeal.



**Certified as a true copy and issued
as the mandate on Apr 23, 2021**

**Attest:**

**Clerk, U.S. Court of Appeals, Fifth Circuit**

# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 1, 2021

Lyle W. Cayce
Clerk

No. 20-50277

ALBINA ROQUE, *individually, as her at law to the Estate of Jason Roque, and on behalf of all wrongful death beneficiaries*; VINCENTE ROQUE, *individually, as heir at law to the Estate of Jason Roque, and on behalf of all wrongful death beneficiaries*,

*Plaintiffs—Appellees*,

*versus*

JAMES HARVEL, *in his individual capacity*,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:17-CV-932

Before KING, ELROD, and WILLETT, *Circuit Judges*.

DON R. WILLETT, *Circuit Judge*:

This qualified-immunity case involves the police shooting and killing of Jason Roque, a suicidal man experiencing a mental-health crisis. Roque's parents sued James Harvel, the officer who killed their son, alleging a violation of their son's Fourth Amendment right against the use of excessive force.

The Fourth Amendment turns on reasonableness. And "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."[1] This allowance is particularly understandable when police officers encounter suicidal suspects. At some point, however, and even in the most difficult circumstances, the reasonableness rope ends. Here, the district court decided a jury should determine whether it ended after Officer Harvel's first shot. We agree and therefore affirm the district court's denial of summary judgment.

I

The Austin Police Department received two related 911 calls on the morning of May 2, 2017. Jason Roque made the first call to report a shirtless, Hispanic man "just going crazy" with a black pistol—not pointing it at anybody but "all up in the air and whatnot." Jason was speaking about himself but didn't disclose that fact to the 911 operator. Jason's mother, Albina, then called 911. While crying and pleading with Jason, she told the operator that her son wanted to kill himself. Both Jason and Albina called to report the incident from their home address.

During the 911 calls, Officer Harvel was on patrol in northeast Austin, where the Roques live. Harvel learned of the 911 calls through his radio and the dispatch report. Dispatch first described the calls as "Gun Urgent" but changed the reported problem to "Attempted Suicide." Dispatch also noted that Jason's only recent involvement with law enforcement was an allegation of criminal mischief the year before.

---

[1] *Graham v. Connor*, 490 U.S. 386, 396–97 (1989).

No. 20-50277

Multiple officers, including Harvel, responded to the situation. Harvel and the other officers positioned themselves at the end of Jason's street about 75 yards from Jason's house. Jason was pacing the sidewalk in front of his home with a black gun in his waistband. He was repeatedly saying, "Shoot me!" Albina was standing on the porch imploring Jason not to kill himself. The officers could hear—but not see—Albina from where they were standing. One officer yelled, "Put your hands up!" Jason put his arms out to the side and continued walking on the sidewalk. He yelled at the officers to shoot and kill him.

Jason then pulled out the gun, which was later determined to be a BB gun. Jason pointed the gun at his head then turned away from the officers and said, "I'll f---ing kill myself!" An officer then yelled (for the first time): "Put the gun down!"

The parties dispute what happened next. Video evidence (taken from two different home-surveillance systems)[2] shows that, after the officer's order to put his gun down, Jason turned around to face the officers with the gun pointed in the air. All of the officers claim, however, that they didn't know where the gun was and didn't see Jason point it in their general direction. Nonetheless, in the split second between the officer's command to put the gun down and Jason's turning his body toward the officers with his arm and the gun in the air, Harvel shot Jason with a semi-automatic rifle. The video shows Jason immediately double over, drop the gun, and stumble from the sidewalk toward the street (away from his mother and the officers). The video also shows the black gun hitting the white sidewalk in broad daylight.

---

[2] The first video is from the position of the officers, although about one house closer to where Jason was located. https://www.ca5.uscourts.gov/opinions/pub/20/20-50277-1.mp4. The second video is from the home of the Roques' neighbor. https://www.ca5.uscourts.gov/opinions/pub/20/20-50277-2.mp4.

No. 20-50277

Harvel claims that he didn't see the gun fall and considered Jason to be a continuing threat to his mother.

About two seconds after the first shot, while Jason was stumbling into the street, Harvel fired another shot that missed Jason. Jason continued floundering into the street, and two seconds later, Harvel took a final and fatal shot. The police officers then approached Jason's body and unsuccessfully attempted CPR. Paramedics took Jason to the emergency room; he died soon after. Harvel maintains that he took each shot because he thought Jason was a threat to his mother's life and safety.

Jason's parents, Albina and Vincente Roque, sued Officer Harvel as well as the City of Austin under 42 U.S.C. § 1983 for violations of Jason's Fourth Amendment rights. Both Harvel and the City moved for summary judgment. The City argued that it could not be liable under § 1983 because the Roques failed to show any official policy or custom that caused the alleged constitutional violation.[3] The district court agreed with the City and granted its motion. Harvel raised the defense of qualified immunity. The district court granted Harvel's motion as to the first shot but denied the motion as to the second and third shots. Harvel timely filed this interlocutory appeal.

## II

Qualified immunity "attempts to balance two competing societal interests: 'the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment,

---

[3] *See Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 694 (1978) ("We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.").

distraction, and liability when they perform their duties reasonably.'"[4] The defense of qualified immunity therefore protects public officials "sued in their individual capacities 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[5] A court's decision on qualified immunity involves two questions: (1) whether the defendant violated the plaintiff's constitutional or statutory rights; and (2) whether those rights were clearly established at the time of the violation "such that the officer was on notice of the unlawfulness of his or her conduct."[6]

The unique nature and purpose of qualified immunity affects both our jurisdiction and the lens with which we review a district court's denial of the defense. We first discuss the changes to our jurisdiction and then the scope of our review.

When a district court denies summary judgment, that order "is generally not a final decision within the meaning of [28 U.S.C] § 1291 and is thus generally not immediately appealable."[7] But an exception, the collateral-order doctrine, applies when the summary-judgment motion is based on qualified immunity.[8] That's because immunity is collateral to the merits.[9] And an immunity determination cannot be "effectively reviewed on appeal

---

[4] *Joseph v. Bartlett*, 981 F.3d 319, 328 (2020) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

[5] *Joseph*, 981 F.3d at 328 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[6] *Cole v. Carson*, 935 F.3d 444, 451 (5th Cir. 2019), *as revised* (Aug. 21, 2019), *cert. denied sub nom. Hunter v. Cole*, 141 S. Ct. 111 (2020).

[7] *Plumhoff v. Rickard*, 572 U.S. 765, 771 (2014).

[8] *Id.* at 771–72.

[9] *Id.* at 772.

from a final judgment because by that time the immunity from standing trial will have been irretrievably lost."[10] Accordingly, a district court's immunity decision is akin to a final decision, and a defendant who loses on the qualified-immunity defense can bring an interlocutory appeal.[11]

Qualified immunity also affects the scope of our review. The summary-judgment question is whether the movant has shown "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[12] When the district court answers this question, it inherently makes two separate findings regarding whether there are genuine fact disputes and whether those fact disputes are material to the outcome of the case.[13] Typically, we review the district court's analysis de novo, asking the same questions the district court does regarding genuineness and materiality.[14] But on interlocutory appeal following the denial of qualified immunity, the scope of our review is limited to "whether the factual disputes that the district court identified are *material* to the application of qualified immunity."[15] Our review therefore involves only "whether a given course of conduct would be objectively unreasonable in light of clearly established law."[16] We do not review the district court's determination that there are genuine fact disputes.[17]

---

[10] *Id.*

[11] *See generally Mitchell v. Forsyth*, 472 U.S. 511, 536 (1985).

[12] Fed. R. Civ. P. 56(a).

[13] *Colston v. Barnhart*, 146 F.3d 282, 284 (5th Cir. 1998).

[14] *Id.; see also Samples v. Vadzemnieks*, 900 F.3d 655, 659–60 (5th Cir. 2018).

[15] *Samples*, 900 F.3d at 660.

[16] *Kinney v. Weaver*, 367 F.3d 337, 347 (5th Cir. 2004) (en banc).

[17] *See Melton v Phillips*, 875 F.3d 256, 261 (5th Cir. 2017) (en banc) ("[W]e lack jurisdiction to review the *genuineness* of a fact issue but have jurisdiction insofar as the

No. 20-50277

Plaintiffs argue that we lack jurisdiction over this entire appeal because the district court found that genuine fact disputes precluded summary judgment. As explained above, however, "[w]e do have jurisdiction, but only to the extent that the appeal concerns the purely legal question whether the defendants are entitled to qualified immunity on the facts that the district court found sufficiently supported in the summary judgment record."[18]

## III

Although qualified immunity raises two distinct questions (whether the conduct was unconstitutional and whether the unconstitutionality was clearly established), we have discretion "to decline entirely to address the" first question.[19] We can "skip straight to the second question concerning clearly established law."[20] But we have repeatedly emphasized that there is value in addressing both questions "to develop robust case law on the scope of constitutional rights."[21] In that vein, we first address Plaintiffs' Fourth

---

interlocutory appeal challenges the *materiality* of [the] factual issues.") (quoting *Allen v. Cisneros*, 815 F.3d 239, 244 (5th Cir. 2016)).

[18] *Kinney*, 367 F.3d at 347 (5th Cir. 2004) (en banc).

[19] *Morgan v. Swanson*, 659 F.3d 359, 384 (5th Cir. 2011).

[20] *Id.*

[21] *Joseph v. Bartlett*, 981 F.3d 319, 331 n.40 (5th Cir. 2020) (citing *Morgan*, 659 F.3d at 395).

Amendment claim and then discuss the clearly established law at the time of the shooting.

## A

The Fourth Amendment's right to be free from unreasonable seizures governs excessive-force claims.[22] To prove an excessive-force claim, "a plaintiff must show (1) an injury, (2) which resulted directly and only from the use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable."[23]

Excessive-force claims are "necessarily fact-intensive," so we must "examine the totality of the circumstances to determine whether an officer's actions were objectively unreasonable."[24] "The intent or motivation of the officer is irrelevant; the question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force."[25] We only consider the facts "knowable to the defendant officers" at the time the officers used force, and we must be "careful to avoid 'second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation.'"[26]

---

[22] *Garza v. Briones*, 943 F.3d 740, 744–45 (5th Cir. 2019); *Graham v. Connor*, 490 U.S. 386, 395 (1989) ("[*A*]*ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach.").

[23] *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009) (quoting *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir.2009)).

[24] *Garza*, 943 F.3d at 745 (cleaned up).

[25] *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996) (citing *Graham*, 490 U.S. at 396–97); *see also Kingsley v. Hendrickson*, 576 U.S. 389, 391–92 (2015).

[26] *Garza*, 943 F.3d at 745 (first quoting *White v. Pauly*, 137 S. Ct. 548, 550 (2017) (per curiam) then quoting *Ryburn v. Huff*, 565 U.S. 469, 477 (2012)).

When an officer uses deadly force, that force is considered excessive and unreasonable "unless the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others."[27] Further, "an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased."[28]

The parties do not dispute the district court's conclusion that, even though all of the officers claim they didn't see Jason point the gun in their direction, Harvel was justified in taking the first shot. The video evidence (from all angles) shows that right before the first shot, and after the officers shouted at Jason to put down his gun, Jason pointed the gun in the officers' general direction. It's also undisputed that Jason Roque suffered an injury (element one of his excessive-force claim).

At issue, then, is whether Officer Harvel's second and third shots were excessive (element two) and objectively unreasonable (element three). These questions are "often intertwined."[29] Because Officer Harvel used deadly force, the answer to these intertwined questions depends on whether Jason posed a threat of serious physical harm after the first shot struck him. Two factual disputes concerning the placement of the gun and Jason's movements prevent us from answering these questions.

First, the gun. Harvel asserts that, after the first shot, he perceived Jason to be a continuing threat to his mother because he didn't see Jason drop his gun. Plaintiffs argue, with video and expert evidence, that a reasonable

---

[27] *Romero v. City of Grapevine*, 888 F.3d 170, 176 (5th Cir. 2018) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).

[28] *Lytle v. Bexar Cnty.*, 560 F.3d 404, 413 (5th Cir. 2009).

[29] *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012).

officer should have seen Jason drop his black gun on the white sidewalk in broad daylight. Second, Jason's movements. Harvel claims that Jason was "still moving and ambulatory" after the first shot. Plaintiffs counter that the video shows Jason double over and stumble into the street. Even though Jason was still moving, Plaintiffs assert that these movements show a wounded man moving away from everyone at the scene.

Both fact disputes go to whether a reasonable officer would have known that Jason was incapacitated after the first shot. If Jason was incapacitated, he no longer posed a threat. And if he no longer posed a threat, Harvel's second and third shots were excessive and unreasonable. Whether Jason was incapacitated is therefore not only disputed but material to Plaintiffs' Fourth Amendment claim.

Harvel's only arguments to the contrary center around whether Plaintiffs' evidence is sufficient to dispute his subjective version of events. These arguments fail. On interlocutory appeal, "we cannot challenge the district court's assessments regarding the sufficiency of the evidence—that is, the question whether there is enough evidence in the record for a jury to conclude that certain facts are true."[30] So we accept the district court's evidence-sufficiency (or genuineness) determination. And we agree with its determination that material fact disputes preclude summary judgment on the Fourth Amendment question.

---

[30] *Cole v. Carson*, 935 F.3d 444, 452 (5th Cir. 2019), *as revised* (Aug. 21, 2019), *cert. denied sub nom. Hunter v. Cole*, 141 S. Ct. 111 (2020) (quoting *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015)); *accord Colston v. Barnhart*, 146 F.3d 282, 284 (5th Cir. 1998) ("*Johnson* makes clear that an appellate court may not review a district court's determination that the issues of fact in question are genuine.").

B

Even if genuine disputes of material fact exist concerning the Fourth Amendment violation, Harvel is entitled to qualified immunity unless his "actions were objectively unreasonable in light of clearly established law at the time of the" shooting.[31] The critical question when ascertaining the clearly established law is "whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional."[32] Put differently, "[a] clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'"[33]

A plaintiff must "identify a case—usually, a body of relevant case law—in which an officer acting under similar circumstances was held to have violated the Constitution."[34] While a plaintiff need not find a case "directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate."[35] The Supreme Court has also explained that the clearly established law "should not be defined 'at a high level of generality.'"[36] It "must be 'particularized' to the facts of the case."[37] But, "in an obvious case," general standards "can 'clearly establish' the

---

[31] *Newman v. Guedry*, 703 F.3d 757, 761 (5th Cir. 2012) (quoting *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008)).

[32] *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (cleaned up).

[33] *Mullenix v. Luna*, 577 U.S. 7, 11–12 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 663 (2012)).

[34] *Joseph v. Bartlett*, 981 F.3d 319, 330 (5th Cir. 2020) (cleaned up).

[35] *Mullenix*, 577 U.S. at 12 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

[36] *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *al–Kidd*, 563 U.S. at 742).

[37] *White*, 137 S. Ct. at 552 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

answer, even without a body of relevant case law."[38] As the Supreme Court has summarized, qualified "immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"[39]

Finally, "drawing inferences in favor of the nonmovant" is especially important when determining whether there is clearly established law.[40] That's because the Supreme Court has "instructed that courts should define the 'clearly established' right at issue on the basis of the 'specific context of the case.'"[41] So "courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions."[42] In other words, a court assessing the clearly established law cannot "resolve[] disputed issues in favor of the moving party."[43] And it must "properly credit[]" Plaintiffs' evidence.[44]

The district court implied that this was an obvious case under *Tennessee v. Garner*. In *Garner*, the Supreme Court held that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead."[45] Although the officer in *Garner* shot and killed a fleeing burglary

---

[38] *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004); *see also Taylor v. Riojas*, 141 S. Ct. 52, 53–54 (2020).

[39] *White*, 137 S. Ct. at 551 (quoting *Mullenix*, 577 U.S. at 12).

[40] *Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

[41] *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

[42] *Id.*

[43] *Id.*; *see also Good v. Curtis*, 601 F.3d 393, 398 (5th Cir. 2010) ("[A] defendant challenging the denial of a motion for summary judgment on the basis of qualified immunity must be prepared to concede the best view of the facts to the plaintiff.").

[44] *Tolan*, 572 U.S. at 660.

[45] 471 U.S. 1, 11–12 (1985) (holding unconstitutional a Tennessee statute that authorized the use of deadly force against fleeing felony suspects).

No. 20-50277

suspect who was never armed,[46] we have applied *Garner* to situations where a suspect has a weapon but is incapacitated or otherwise incapable of using it (functionally unarmed).[47]

The district court stated that, according to Plaintiffs' narrative, which is supported by video evidence, Jason never pointed the gun at anyone but himself. Before the first shot, Jason simply waved the gun in an arc as he turned around to look in the officers' direction right after they yelled at him to drop the gun. As Jason was turning around, Harvel took the first shot. The shot hit Jason, and he dropped the gun and stumbled into the street away from the officers and his mother. Thus, the district court concluded that under these facts, it was obviously unconstitutional to continue shooting at an unarmed suspect who was limping away from everyone present.

Harvel argues that this is not an obvious case for the same reasons he argues that there are no disputed facts: "All of the officers, including Officer Harvel, believed that after the first shot, Roque was still armed. Roque was not compliant with police commands, was not running away or surrendering but was armed, mobile and capable of firing his weapon at his mother." Plaintiffs' evidence contradicts all of these points, and the district court already decided these facts were genuinely disputed. As stated above, we lack jurisdiction to resolve the genuineness of factual disputes.[48] Further, we prioritize video evidence.[49] If the jury accepts Plaintiffs' narrative, which is

---

[46] *Id.* at 3.

[47] *See, e.g.*, *Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 277 (5th Cir. 2015).

[48] *Joseph v. Bartlett*, 981 F.3d 319, 331 (2020); *Cole v. Carson*, 935 F.3d 444, 452 (5th Cir. 2019), *as revised* (Aug. 21, 2019), *cert. denied sub nom. Hunter v. Cole*, 141 S. Ct. 111 (2020).

[49] *Joseph*, 981 F.3d at 325.

supported by video evidence, then Harvel shot a suicidal, unarmed, wounded man who was a threat only to himself. That would make this case an "obvious" one.[50]

But we need not rely on obviousness here, as multiple cases show that by May 2, 2017, the day that Harvel shot Jason, it was clearly established that after incapacitating a suspect who posed a threat, an officer cannot continue using deadly force.[51]

The closest case is *Mason v. Lafayette City-Parish Consolidated Government*.[52] In *Mason*, officers responded to a suspected armed robbery at an apartment.[53] The apartment belonged to the suspect's girlfriend, and both the suspect and girlfriend were inside.[54] When the police arrived, the couple opened the door and found the officers with their guns drawn.[55] The girlfriend told the officers that Mason, the suspect, wasn't doing anything wrong.[56] The officers ordered Mason and his girlfriend to put their hands up and get on the ground (although the exact commands were disputed).[57] One

---

[50] *See Cole*, 935 F.3d at 453–54 (collecting cases).

[51] *See Lytle v. Bexar Cnty.*, 560 F.3d 404, 413 (5th Cir. 2009) ("A passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect"); *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014) ("This would be a different case if petitioners had initiated a second round of shots after an initial round had clearly incapacitated Rickard and had ended any threat of continued flight, or if Rickard had clearly given himself up.").

[52] 806 F.3d 268 (5th Cir. 2015).

[53] *Id.* at 272.

[54] *Id.*

[55] *Id.* at 273.

[56] *Id.*

[57] *Id.*

of the officers unleashed his dog after he saw, and yelled to the other officers, that Mason had a gun.[58]

The officer claimed that when the dog attacked Mason, Mason reached for his gun.[59] In response, the officer started shooting.[60] The officer's initial round of shots, five in total, all hit Mason in different parts of his body.[61] After the fifth shot, Mason was face down on the ground, and the officer temporarily stopped firing.[62] The officer claimed that Mason made a movement that indicated he was reaching for his gun, so the officer fired two more shots into Mason's back.[63] Mason died at the scene.[64]

Mason's girlfriend told a different story. She said that Mason never did anything to justify the dog attack, never touched his gun, and never attempted to resist the officers.[65] She also claimed that after the first five shots, Mason only picked up his head and put it back down—he never moved in a threatening manner.[66] An expert also testified that after the first five shots, Mason could have moved, but not effectively, and moving his arm toward the gun would have been very painful.[67]

---

[58] *Id.*

[59] *Id.*

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] *Id.* at 274.

[64] *Id.*

[65] *Id.* at 273.

[66] *Id.*

[67] *Id.*

We held that the officer was entitled to qualified immunity for the first five shots, but given the competing narratives, there were material fact disputes as to the final two shots.[68] Specifically, whether Mason was incapacitated after the first five shots was disputed and material to the outcome of the case.[69] We further stated that, under *Garner*, an officer cannot use deadly force when a suspect poses no immediate threat, and it was "obvious" that an officer could not shoot an incapacitated suspect.[70] We therefore concluded that whether Mason was incapacitated was material to both the constitutional violation and the clearly established law.[71]

Harvel attempts to distinguish *Mason* by recycling the same argument that there is no fact dispute about whether Harvel believed Roque was a continuing threat. Harvel also, once again, claims that the evidence is undisputed that Jason was not incapacitated after the first shot because "[h]e was not motionless." As we previously stated, these arguments about the genuineness of the fact disputes are inappropriate in this interlocutory appeal.

There are certainly differences between *Mason* and this case. Mason was attacked by a dog and was lying face down when the officer fired the last two shots.[72] But Mason still had his gun.[73] And both the plaintiffs and defendants stated that Mason continued to make some movements.[74] We

---

[68] *Id.* at 278.

[69] *Id.*

[70] *Id.* at 277–78.

[71] *Id.*

[72] *Id.* at 277.

[73] *Id.*

[74] *Id.*

determined it was for the jury to decide whether those movements made Mason a threat that justified the officer's use of deadly force. So too here. Jason was not lying down after the first shot, but, as the video indisputably shows, he was unarmed and stumbling into the street, moving further away from anyone else. Whether a reasonable officer would have thought Jason was incapacitated or a threat to his mother is a question for the jury to decide. What's more, we held in *Mason* that if the jury accepted the plaintiff's set of facts, the case was "obvious" under *Garner*. If *Mason* was obvious in 2015, then the similar fact pattern in this case, which occurred two years later, is at least clearly established.

Our unpublished decision in *Graves v. Zachary* in 2008 is also instructive—not for its precedential value but for discerning the clearly established law we cited in 2008.[75] In that case, Graves arrived at his ex-girlfriend's apartment, asking about her new boyfriend.[76] Graves smelled of alcohol, had a gun and a box of bullets, threatened to shoot himself, and then threatened to shoot his ex-girlfriend, Besek, in the leg.[77] Besek locked herself in a bathroom and called 911.[78] Officers arrived at the scene and told Graves to show his hands, which Graves did while pressing the gun against his temple.[79] The officers claimed that they told Graves to drop his weapon, and

---

[75] *See Joseph v. Bartlett*, 981 F.3d 319, 341 n.105 (5th Cir. 2020) (noting that while unpublished cases "cannot clearly establish the law," they "can illustrate or 'guide us to such authority,' by 'restating what was clearly established in precedents they cite or elsewhere.'") (quoting *Marks v. Hudson*, 933 F.3d 481, 486 (5th Cir. 2019)).

[76] *Graves v. Zachary*, 277 F. App'x 344, 345 (5th Cir. 2008).

[77] *Id.*

[78] *Id.*

[79] *Id.*

Graves didn't comply.[80] Graves said he never heard the order.[81] Allegedly fearing for his life and Besek's, one officer shot Graves; the shot hit Graves in the groin.[82] The parties disputed the impact of the first shot. The officers stated that Graves didn't slump down or drop his weapon. But Graves claimed that, although he was still holding his gun, he "was downed or incapacitated."[83] "After a short delay," the officer fired again, this time hitting Graves in the chest.[84]

We held that there was a factual dispute about whether Graves was incapacitated after the first shot and whether the shooting officer told Graves to put the gun down before shooting him the first time.[85] Those disputes were material, and, accepting Graves's account, "the violation of [Graves's] constitutional rights would have been obvious even without a body of relevant case law."[86] We further explained that a reasonable officer wouldn't need a specific case "to know that he cannot shoot a compliant suspect and that he cannot fire again at someone who is objectively 'downed or incapacitated.'"[87] Since we determined in *Graves* that shooting an incapacitated suspect, even one still holding a weapon, was obviously unconstitutional in 2008, the similar officer conduct here was at a minimum clearly established in 2017.

---

[80] *Id.* at 345–46.

[81] *Id.* at 346.

[82] *Id.*

[83] *Id.*

[84] *Id.*

[85] *Id.* at 348–49.

[86] *Id.* at 349 (cleaned up) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)).

[87] *Id.*

Harvel says the instructive case here is not *Mason* or *Graves* but *Garza v. Briones*.[88] In *Garza*, officers responded to a 911 call about a man (Garza), who was sitting at a bar holding a pistol and what appeared to be a bottle of wine.[89] One officer drew his weapon and repeatedly ordered Garza to drop his gun.[90] Garza ignored the commands and instead "continued to move the firearm around in different directions while making facial gestures" at the officer.[91] The officer radioed for backup and waited.[92] When additional officers arrived, they continued to give Garza commands, which Garza ignored, and they formed a semi-circle around him with their guns drawn.[93] At one point, a witness told one of the backup officers that Garza's gun was not real and was actually just a BB gun. The officer didn't relay this information to the other officers because he couldn't verify it.[94] A minute later, Garza raised his gun and pointed it at the officer who first arrived on the scene.[95] The officer yelled at Garza to stop; Garza again ignored the command.[96] So the officer started shooting.[97] The other officers heard the shots and assumed that Garza was the one shooting so they fired their

---

[88] 943 F.3d 740 (5th Cir. 2019).

[89] *Id.* at 743.

[90] *Id.*

[91] *Id.*

[92] *Id.*

[93] *Id.*

[94] *Id.*

[95] *Id.* at 744.

[96] *Id.*

[97] *Id.*

weapons at Garza until he fell to the ground.[98] In total, the officers fired 61 shots in an 8-second timespan, killing Garza in the process.[99]

Harvel claims that *Garza* controls here because Jason, like Garza, had a BB gun that the officers thought was real. And Jason, like Garza, ignored orders to drop his weapon and displayed erratic behavior, "indicating that he may [have] pose[d] an imminent threat to anyone on the scene."

These arguments are unpersuasive. The first, concerning the BB gun, played no role in the district court's decision. The court noted that the officers didn't know the gun was fake until after their encounter with Jason. As to the second point, the record in *Garza* showed that the officers gave numerous warnings to Garza before shooting. Here, the officers told Jason to drop his weapon once and started shooting barely a second later. No officer, including Harvel, repeated the command, even though Harvel paused between the first and second shots while Jason dropped his gun and limped away. Further distinguishing this case from *Garza* is the video evidence. In *Garza*, we noted that the video evidence supported the officers' story and contradicted the plaintiff's version of events.[100] The video here does the exact opposite.

To sum up, *Garner*, *Mason*, and *Graves* are the most pertinent cases. And those cases show that by 2017, it was clearly established—and possibly even obvious—that an officer violates the Fourth Amendment if he shoots an unarmed, incapacitated suspect who is moving away from everyone present at the scene.

---

[98] *Id.*

[99] *Id.*

[100] *Id.* at 747.

No. 20-50277

IV

    This is a tragic case that raises difficult questions about how police officers should respond to suicidal suspects. Those questions cannot be answered here without the resolution of several factual disputes. And if resolved in Plaintiffs' favor, Harvel is not entitled to qualified immunity. We thus AFFIRM the district court's denial of summary judgment.

# United States Court of Appeals
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

April 23, 2021

Ms. Jeannette Clack
Western District of Texas, Austin
United States District Court
501 W. 5th Street
Austin, TX 78701-0000

    No. 20-50277    Roque v. Harvel
               USDC No. 1:17-CV-932

Dear Ms. Clack,

Enclosed is a copy of the judgment issued as the mandate and a
copy of the court's opinion.

                      Sincerely,

                      LYLE W. CAYCE, Clerk

                      By:
                      Melissa B. Courseault, Deputy Clerk
                      504-310-7701

cc:
     Mr. Jeff S. Edwards
     Mr. Katherine Icenhauer-Ramirez
     Mr. Robert E. Icenhauer-Ramirez
     Mr. David James
     Mr. Henry Gray Laird III
     Mr. Steven C. Lee
     Mr. Scott Charles Medlock
     Mr. Michael C. Singley